**VIRGINIA:**

## IN THE CIRCUIT COURT OF FAIRFAX COUNTY

| | | |
|---|---|---|
| GCORP INTERNATIONAL, INC. | ) | |
| | ) | |
| Plaintiff, | ) | **2015 - 00621** |
| | ) | |
| v. | ) | Case No. _____ |
| | ) | |
| CELCITE MANAGEMENT | ) | |
| SOLUTIONS, LLC, | ) | **JURY TRIAL DEMANDED** |
| 2553 Dulles View Dr., 5th Floor | ) | |
| Herndon, VA  20171 | ) | |
| | ) | |
| AMDOCS, INC. | ) | |
| 1390 Timberlake Manor Parkway | ) | |
| Chesterfield, MO  63017 | ) | |
| | ) | |
| AND | ) | |
| | ) | |
| NADEEM HAIDER | ) | |
| 13010 Morris Rd, 6th Floor | ) | |
| Alpharetta, GA  30004 | ) | |
| | ) | |
| Defendants. | ) | |

<u>COMPLAINT</u>

Plaintiff GCorp International, Inc. ("GCorp") brings this action against Defendants Celcite Management Solutions, LLC (Celcite), Amdocs, Inc. ("Amdocs") and Nadeem Haider ("Haider") for tortious interference with contract, business expectancy and/or prospective business advantage and violation of the Virginia Uniform Trade Secret Act.

This case arises out of a systematic practice by the Defendants of poaching GCorp's contractually-bound engineers.  GCorp would develop relationships with talented engineers who could provide specialized services in the wireless telecommunications field for Celcite and later Amdocs.  GCorp provided these engineers with specialized training and immigration sponsorship

to facilitate their work in the telecommunications industry and the United States. GCorp would place or offer to place these engineer candidates on Celcite (later Amdocs) projects through pre-existing and prospective contractual relationships with Celcite/Amdocs, providing that information under the protection of confidentiality provisions of the contract between GCorp and Celcite/Amdocs. While Celcite at first honored the spirit of the agreement, retaining GCorp's engineers under a Master Services Agreement between the parties, the Defendants soon realized that they could save money by simply eliminating GCorp from the contractual chain. By "poaching" GCorp employees—either directly hiring GCorp engineers that were already working for GCorp on Celcite/Amdocs projects or hiring engineers offered to Celcite/Amdocs by GCorp directly—the Defendants avoided paying GCorp for its substantial investment in the individual engineer's training and immigration status, and misappropriating GCorp's trade secrets for their mutual benefit and the harm of GCorp.

## PARTIES

1.      Plaintiff GCorp International, Inc., is, and at all times relevant hereto was, a corporate entity existing under the laws of the State of Texas.

2.      Defendant Celcite Management Solutions, LLC ("Celcite") is, and at all times relevant hereto was, a limited liability company existing under the laws of the Commonwealth of Virginia.

3.      Defendant Amdocs, Inc. ("Amdocs") is, and at all times relevant hereto was, a corporate entity with its headquarters in Chesterfield, Missouri and office in Virginia. During the relevant period, Amdocs purchased all or substantially all of Celcite, including the contracts and obligations at issue in this lawsuit, operating and continuing the business of Celcite.

4.      Defendant Nadeem Haider ("Haider") is, and at all times relevant hereto was, a citizen and resident of the State of Georgia, having frequent contact with the Commonwealth of Virginia through his job as Executive Vice President of Defendant Celcite. Nadeem Haider was an equity owner of Celcite, before its sale to Amdocs.

## JURISDICTION AND VENUE

5.      This Court has personal and subject-matter jurisdiction in this matter, and venue is properly laid in this Court pursuant to Section 8.01-262(1-4) of the Virginia Code because the causes of action alleged in this complaint arose, in whole or in part, in Fairfax County, there is a substantial nexus to Fairfax County and/or Defendants reside or have registered offices in Fairfax County, Virginia.

## FACTS

6.      On October 13, 2011, GCorp entered into a contract with Celcite to provide subcontracted professional labor in the area of telecommunications engineering, the "Master Services Agreement" ("MSA"), attached hereto as Ex. A.

7.      GCorp recruits talented telecommunications engineers ("GCorp Engineers") to fulfill the needs of Celcite and other corporate clients.  In doing so, GCorp significantly invests in the training and immigration sponsorship (work permits and green cards) for the GCorp Engineers, to insure they are qualified and legally allowed to work for Celcite, Amdocs or other companies on projects in the United States.

8.      In the process of recruiting GCorp Engineers, GCorp would enter into contractual agreements with engineers or engineer candidates that would preclude GCorp Engineers from working directly with GCorp's clients for a specified and limited period of time.

3

9.      Pursuant to the terms of the MSA, GCorp began placing GCorp Engineers with Celcite immediately after the MSA started, growing the relationship between the companies significantly in the first 12-24 months after it was signed.

10.      Also pursuant to the terms of the MSA, GCorp provided information about the availability, immigration status and qualifications of the GCorp Engineers under the protections of a "Confidential Information" provision, which provided that any such information "will be considered trade secrets and will be entitled to all protections under the law for trade secrets." Ex. A.

11.      Collectively, information provided by GCorp to Celcite/Amdocs about the GCorp Engineers' qualifications, immigration status and availability will be referred to herein as "GCorp's Trade Secrets." GCorp's Trade Secrets were provided to Celcite/Amdocs under the MSA for the sole purpose of allowing Celcite/Amdocs to evaluate the qualifications of GCorp's Engineers and ultimately to hire the GCorp Engineers through GCorp.

12.      GCorp protected GCorp's Trade Secrets by holding such information confidential, disclosing it only pursuant to the protections offered under the MSA.

13.      GCorp made a profit from the placement of each GCorp Engineer with Celcite.

14.      The placement of each GCorp Engineer with Celcite was for varying lengths, often years.

15.      Defendants were specifically aware of the contractual status of the GCorp Engineers and were generally aware of the industry-wide practice to secure the talent of telecommunication engineers with non-compete agreements.

16.      Haider was a minority equity owner of Celcite from 2011 to 2013.

4

17.     Haider was intimately familiar with the staffing relationships of GCorp, Celcite and ultimately Celcite's clients, big telecommunications companies such as AT&T Mobility.

18.     In 2013, Amdocs purchased Celcite, including Haider's equity interest in Celcite.

19.     In 2012, Haider and Celcite began to "poach" GCorp Engineers, that is, hire individual GCorp Engineers directly, inducing those individuals to break their contracts with GCorp.

20.     The poaching of GCorp Engineers has continued throughout 2014, despite numerous warnings from GCorp to Defendants about their conduct.

21.     Specifically, Celcite was first warned of the contractual status of GCorp Engineers in 2012.

22.     Upon purchase of Celcite, Amdocs learned of i) the contractual status of the GCorp Engineers, and ii) the existing warnings to Celcite and iii) the previous poaching of GCorp Engineers.  With this knowledge Amdocs continued to poach GCorp engineers through Celcite.

23.     To poach GCorp's Engineers, Celcite and Amdocs misappropriated GCorp's Trade Secrets, utilizing the confidential information provided by GCorp concerning the availability and qualifications of specific, available GCorp Engineers to fill openings in this highly specialized area of wireless telecommunications technology.  Celcite and Amdocs hired GCorp Engineers utilizing GCorp's Trade Secret information, harming GCorp and benefitting Celcite and Amdocs.

24.     In total, at least 10 GCorp Engineers were poached from 2012-2014, including Nitin Yadav, Tauseef Sharif, Eneas Lobo Junior, Victor Sanchez Luna, Farhat Ali Qazi, Mahmood Masqati, Harpreet Singh, Gessner Rivas, Gagadeep Singh Sidhu, and Rajinder Singh.

Collectively, GCorp would have made over $400,000 profit annually from the full time placement of these GCorp Engineers.

25.     By poaching GCorp Engineers, Celcite and Amdocs eliminated the middleman and saved money on the contracted labor it was offering to its client AT&T Mobility and others. By cutting out GCorp from the contractual chain on the work being performed by the GCorp Engineers there was simply more profit to be made for Celcite and Amdocs.

26.     GCorp has been directly harmed through the loss of revenue from the GCorp Engineers over the course of multiple years, the recruitment/retention costs associated with replacing these engineers, direct costs associated Defendants actions and the loss of goodwill.  In total, GCorp has been directly damaged in an amount to be proven at trial, but in excess of $1,800,000.

**COUNT I**
**Tortious Interference with Contract, Business Expectancy**
**and/or Prospective Economic Advantage**
**(All Defendants)**

27.     GCorp repeats and re-alleges the allegations contained in paragraphs 1 through 26, inclusive, as though fully set forth herein.

28.     GCorp had valid contracts and business expectancies in the contractual relationships with the GCorp Engineers.

29.     The Defendants had full knowledge of the contractual relationships between GCorp and the GCorp Engineers, including the non-compete obligations of the GCorp Engineers.

30.     The Defendants intentionally interfered with GCorp's contracts and/or business expectancies with the GCorp Engineers by inducing the GCorp Engineers to breach their

6

agreements with GCorp, including noncompete provisions precluding GCorp Engineers from work for Celcite/Amdocs.

31.     The Defendants improper actions caused GCorp not only to lose its contractual relationship with no less than 10 GCorp Engineers, but lose those Engineers directly to a customer.  As a result, GCorp suffered no less than $1,800,000 in actual expected lost profit on those contracts and business expectancies, consequential damages and loss of goodwill.

32.     In interfering with GCorp's contracts and business expectancies, the Defendants acted willfully, maliciously, and in conscious disregard for the rights of GCorp.

33.     As a direct and proximate result of the Defendant's improper actions, GCorp has suffered and will continue to suffer substantial economic damages in the nature of lost revenue, direct costs, loss of business and economic advantage and loss of goodwill.

**COUNT II**
**Violation of the Virginia Uniform Trade Secrets Act,**
**Va. Code §§ 59.1-336 et seq.**
**(Defendants Celcite and Amdocs)**

34.     GCorp repeats and re-alleges the allegations contained in paragraphs 1 through 33, inclusive, as though fully set forth herein.

35.     GCorp's Trade Secrets (information concerning the GCorp Engineers' qualifications, immigrations status and availability as provided pursuant to the Confidential Information provision of the MSA) represented a trade secret that had independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

36.     GCorp's Trade Secrets were developed over the course of multiple years in competitive recruitment and training of skilled engineers.

37.     GCorp's Trade Secrets enabled GCorp to gain a competitive advantage over other companies in their market. The misappropriation of this information by Celcite/Amdocs seriously impacted GCorp's business and profitability.

38.     GCorp's Trade Secrets were the subject of efforts that were reasonable under the circumstances to maintain their secrecy. Specifically, the MSA specifically protected the information shared by GCorp with Celcite and Amdocs and all parties were aware of their obligations regarding trade secret material.

39.     Celcite and Amdocs were in possession of GCorp's Trade Secrets.

40.     Celcite and Amdocs induced the GCorp Engineers to break their agreements with GCorp and work directly for Celcite/Amdocs, using the GCorp Trade Secrets. Celcite and Amdocs utilized the information provided to them for the purpose of evaluating GCorp Engineers to instead directly contact, solicit and procure their services, a clear misappropriation of that information.

41.     The misappropriation of GCorp's Trade Secrets by Celcite and Amdocs was willful and malicious.

42.     By virtue of the misappropriation by Celcite and Amdocs, GCorp has suffered and will continue to suffer substantial economic damages in the nature of lost revenue, direct costs, loss of business and economic advantage, loss of goodwill and attorneys' fees.


## REQUEST FOR RELIEF

WHEREFORE, Plaintiff GCorp International, Inc., respectfully requests that the Court enter judgment in its favor and against Defendants, jointly and severally, in an amount to be proven at trial, but no less than the following amounts: (1) actual damages in an amount to be

proven at trial but no less than $1,800,000.00; (2) punitive damages in the amount of

$350,000.00; (3) pursuant to the VUTSA, all attorneys' fees and costs incurred in connection

with this action; (4) prejudgment and post judgment interest at the judgment rate; and (5) such

other and further relief as the Court may deem necessary and proper.

**TRIAL BY JURY IS DEMANDED.**

GCORP INTERNATIONAL, INC.
By Counsel

Lee E. Berlik (VSB# 39609)
Jay M. McDannell (VSB# 45630)
BERLIKLAW, LLC
1818 Library Street
Suite 500
Reston, Virginia  20190
Tel: (703) 722-0588
Fax: (888) 772-0161
LBerlik@berliklaw.com
JMcDannell@berliklaw.com

9

# Exhibit A



**Celcite**

In line with client needs and evolving technologies™

---

| MASTER SERVICES AGREEMENT |
|---|

This Master Services Agreement is made and executed this ___13ᵗʰ___ day of _OCTOBER_ , 20 _11_____ between GCORP INTERNATIONAL INC located at 1755 N Collins Blvd, Suite 325, Richardson, TX 75080 ("Subcontractor"), and Celcite Management Solutions, LLC located at 13800 Coppermine Rd, Herndon, VA-20171, USA ("Purchaser") collectively referred to as "Parties."

### PREAMBLE

Whereas, Subcontractor is engaged in the business of providing telecom professionals who are highly skilled in telecom related work and associated software tools; and

Whereas, Purchaser desires to obtain the services provided by the Subcontractor:

NOW THEREFORE, in consideration of the mutual promises, covenants and agreements contained herein, the parties have agreed and do agree as follows:

1.  Term of Agreement. The term of this Agreement will commence on the date first set forth above and will continue for a period of one year and rolling on a monthly basis thereafter, until terminated by either party.

2.  Services. This Agreement does not obligate Purchaser to use Subcontractor services. From time to time during the term of this Agreement, Purchaser may notify the Subcontractor of its need for telecom professionals ("Consultants") and Subcontractor will provide Purchaser with such Consultants to perform Services in accordance with the terms of this Agreement and Professional Services Work Orders ("Work Orders") completed by the parties in the form attached hereto as Exhibit "A." All Consultants will be required to sign a Consultant Non-Solicitation Agreement (to be provided under separate cover).

3.  Professional Services Work Orders: All authorizations for Subcontractor services will be issued by Purchaser in the form of a Work Order. All terms and conditions of this Agreement apply to and govern all Work Orders. For all services provided under this Agreement, both Purchaser and Subcontractor must agree to and sign the Work Order before any obligations are incurred by either party as to the requested Services.

4.  Fees and Payment Terms. For the Services provided by Subcontractor, Purchaser agrees to pay Subcontractor the fee agreed upon in the Work Order(s). Subcontractor shall invoice Purchaser once every last day of the month. All the invoices will be submitted along with weekly time cards. Purchaser will pay such fees within 30 days of date of acceptable invoices from Subcontractor.

*Purchaser shall send all payments to:*

GCORP INTERNATIONAL INC.
1755 N COLLINS BLVD, SUITE 325
RICHARDSON, TX 75080



**In line with client needs and evolving technologies™**

5. <u>Confidential Information</u>. In the course of the performance of this Agreement, either party (the "Recipient") may learn Confidential Information of the other party (the "Owner"). Recipient agrees to disclose such information to its employees only on a need-to-know basis and agrees not to disclose such information to third parties unless legally required by judicial process. "Confidential Information" means information, including hard copy or electric form, written or oral, which a reasonable person would consider to be confidential in nature. Confidential Information does not include information that (1) becomes public through no breach of Recipient; (2) Recipient rightfully receives from a third party without restriction; (3) Recipient develops it independently or already had knowledge of such information prior to disclosure by Owner; and (4) Owner gives to any third party without confidentiality limitations. All Confidential Information will be considered trade secrets and will be entitled to all protections under the law for trade secrets. In no event shall Recipient use the Owner's Confidential Information to reverse engineer or otherwise develop products or services functionally equivalent to the products or services of the Owner. The parties' obligations under this section will survive the termination of this Agreement

6. <u>Non-Solicitation</u>. Subcontractor will not, either directly or indirectly (except through Purchaser) solicit Purchasers' employees and clients for a period of 12 months from the date of completion of the last work order issued by the Purchaser.

7. <u>Relationship of the Parties</u>. Subcontractor is an independent contractor and is neither an employee nor agent of Purchaser. Nothing contained in this Agreement will be construed as creating a joint venture, partnership or employment relationship between the parties hereto, nor will either party have the right, power or authority to create any obligation or duty, express or implied, on behalf of the other. All Subcontractor employees whom it assigns to perform services for Purchaser shall at all times be considered employees of Subcontractor. Neither party will be responsible for the other's business obligations, including but not limited to, insurance, worker's compensation and employment related taxes) and each party agrees to hold the other harmless from those obligations.

8. <u>Warranty of Services</u>: Subcontractor warrants that all services provided pursuant to this Agreement will be performed in accordance with the general standards of the industry. THE FOREGOING EXPRESS LIMITED WARRANTY IS IN LIEU OF ALL OTHER WARRANTIES AND CONDITIONS EXPRESSED OR IMPLIED, ORAL OR WRITTEN, CONTRACTUAL OR STATUTORY, INCLUDING BUT NOT LIMITED TO ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE TO THE EXTENT APPLICABLE.

9. <u>PROPRIETARY RIGHTS</u>. Subcontractor agrees that the Work Product provided hereunder, rights, title and interests shall be deemed to be the exclusive property of the Purchaser. To the extent that Subcontractor utilizes any of its property in connection with the performance of services here under, such property shall remain the property of the Subcontractor.

10. <u>Indemnification</u>. Each party shall indemnify, defend and hold harmless the other, its employees, principals (partners, shareholders or holders of an ownership interest, as the case may be) and agents, from and against any third party claims, demands, loss, damage or expense relating to bodily injury or death of any person or damage to real and/or tangible personal property directly caused by the negligence or willful misconduct of the indemnifying party, its personnel or agents in connection with the performance of the Services hereunder. To receive the foregoing indemnities, the party seeking



**in line with client needs and evolving technologies™**

indemnification must promptly notify the other in writing of a claim or suit and provide reasonable cooperation (at the indemnifying party's expense) and full authority to defend or settle the claim or suit. The indemnifying party shall have no obligation to indemnify the indemnified party under any settlement made without the indemnifying party's written consent.

11. <u>Other Agreements</u>. Subcontractor's execution, delivery and performance of this Agreement will not violate any employment, nondisclosure, confidentiality, consulting or other agreement to which Subcontractor is party or by which it may be bound.

12. <u>Insurance and Licenses</u> Subcontractor agrees to maintain the following insurance coverage in full force during the term of this Agreement or as otherwise directed and furnish certificate of such insurances on request from CELCITE:

    12.1 <u>Commercial General Liability Insurance</u>: Subcontractor must maintain commercial general liability insurance, on an occurrence basis, covering all operations by or on behalf of Subcontractor against bodily injury (including death) and property damage (including loss of use), including premises/operations, personal and advertising injury, products/completed operations, and contractual liability. This commercial general liability insurance must be in limits of liability of not less than $1,000,000 per occurrence, combined single limit for bodily injury and property damage, with a $2,000,000 general aggregate. Such commercial general liability insurance shall include a full waiver of subrogation in favor of CELCITE, its affiliates and subsidiaries.

    12.2 <u>Automobile Insurance</u>: Subcontractor must maintain business automobile liability insurance, including coverage for all owned, hired and non-owned automobiles. The amount of automobile insurance must not be less than $1,000,000 combined single limit each accident for bodily injury and property damage.

    12.3 <u>Workers' Compensation and Employer's Liability Insurance</u>: Subcontractor must maintain Workers' compensation insurance as mandated by state law at all locations where Subcontractor conducts operations. Further, Subcontractor must obtain and maintain Employer's liability insurance in an amount not less than $1,000,000.

    12.4 <u>Umbrella/Excess Insurance</u>: Subcontractor must maintain an umbrella insurance policy, on an occurrence basis, providing coverage in excess of commercial general liability, business automobile liability, and employer's liability, in an amount not less than $5,000,000 per occurrence, combined single limit for bodily injury and property damage.

    12.5 <u>Property and Builder's Risk Insurance</u>: Subcontractor must maintain "all risks" or "special causes of loss" (including theft) property insurance on its business personal property, including, without limitation, its tools, equipment, machinery, materials and supplies in an amount sufficient to repair or replace such property. If the Services include the installation or erection of structures or equipment on behalf of CELCITE, Subcontractor must also maintain "all risk" or "special causes of loss" (including theft) builder's risk or installation insurance. This insurance must be in an amount not less than the full replacement cost of such structure or equipment at time of completion. Such property and builder's risk insurance shall include a full waiver of subrogation in favor of CELCITE, its affiliates and subsidiaries.

# **Celcite**

in line with client needs and evolving technologies™

12.6 Professional Liability Insurance: If applicable (as required in the attached Work Order), Subcontractor must maintain Professional Liability Insurance covering Subcontractor's error and/or omissions when acting as a licensed professional, in an amount not less than $1,000,000.00. If the policy is written on claims-made basis, then the coverage must remain in force for a period of one (1) year following the completion of Services.

12.7 Other Insurance: Depending upon the work and nature of the Subcontractor's operations, CELCITE reserves the right to request additional types of insurance coverage, including but not limited to Environmental Impairment Liability, Rigger's Liability, and Transit Insurance. Subcontractor further agrees to abide by any and all insurance requirements imposed upon CELCITE by CELCITE's landlord, licensor or other designee, including, without limitation, naming such parties as additional insured's.

12.8 Certificates of Insurance: If applicable and requested by the Purchaser, the Subcontractor must provide CELCITE with certificates of insurance evidencing the coverage required by this Agreement prior to commencing work hereunder.  The certificates of insurance must provide that the policies will not be cancelled without thirty (30) days prior written notice to CELCITE.  CELCITE will be named as an additional insured under the insurance policies that Subcontractor is required to maintain under Sections 13 of this Agreement.   All insurance policies and coverage that Subcontractor is required to carry and maintain under this Agreement will be primary and non-contributing with respect to any policies carried by CELCITE and any coverage carried by CELCITE will be excess insurance.

12.9 Subcontractor Insurance Obligations: Subcontractor must obtain contractual obligations and enforce those obligations from and against each of their contractors or consultants, if working under this MSA and only if they are not direct employees of the Subcontractor. Subcontractor will obtain and maintain insurance coverage and limits of liability of the same type and the same amount as are required of Subcontractor under this Section 12.     Subcontractor must obtain, prior to the commencement of the subcontractor's work, certificates of insurance, evidencing compliance with the insurance requirements contained herein.

12.10 Specific Insurance and License Requirements: Upon request by CELCITE and as a condition of performing Services in any given CELCITE market or region, Subcontractor must submit proof to the local CELCITE representative that Subcontractor has the appropriate insurance coverage and/or Subcontractor licenses as may be required in the local jurisdiction, county or state where the Services will be preformed.

13.  Termination.

    a)  Without affecting the continued operation of this Agreement, individual Work Orders may be terminated under this Agreement by either party:

        i)  Upon  5 days prior written notice to the other party; or
        ii)  If the other party is in material breach of any of its obligations under this Agreement and/or Work Order and fails to remedy such breach within 3 days of receipt of a written notice by the other party which specifies the material breach.



In line with client needs and evolving technologies™

b) Upon termination by either party, Purchaser will pay Subcontractor for all services performed and charges and expenses incurred by Subcontractor up to the date of termination.

14. <u>General Provisions</u>:

a) <u>Waiver</u>. Neither party's failure to exercise any of its rights under this Agreement will constitute or be deemed a waiver or forfeiture of those rights.

b) <u>Force Majeure</u>. Neither party will be liable to the other for failure to perform its obligations hereunder if and to the extent that such failure to perform results from causes beyond its control, including, without limitation, strikes, lockouts, or other industrial disturbances; civil disturbances; fires; acts of God; acts of a public enemy; compliance with any regulations, order, or requirement of any governmental body or agency; or inability to obtain transportation or necessary materials in the open market.

c) <u>Notices</u>. All notices required under or regarding this Agreement will be in writing and will be considered given if delivered personally, mailed via registered or certified mail (return receipt requested and postage prepaid), given by facsimile (confirmed by certification of receipt) or sent by courier (confirmed by receipt), or sent via email, addressed to the following designated parties:

**Celcite Management Solutions, LLC**
**Attention: Kelly A. Fitzsimmons**
**13800 Coppermine Road**
**Herndon, VA 20171**

d) <u>Severability</u>. If any term or provision of this Agreement is held to be illegal or unenforceable, the validity or enforceability of the remainder of this Agreement will not be affected.

e) <u>Entire Agreement</u>. This Agreement and the Work Order(s) submitted hereunder constitute the entire agreement between the parties and supersede any prior or contemporaneous communications, representations or agreements between the parties, whether oral or written, regarding the subject matter of this Agreement. The terms and conditions of this Agreement may not be changed except by an amendment signed by an authorized representative of each party.

f) <u>Applicable Law</u>: This Agreement is made under and will be construed in accordance with the law of Virginia without giving effect to that state's choice of law rules.



**in line with client needs and evolving technologies™**

**GCORP INTERNATIONAL INC**

By: GAURAV KUMAR

Title: PRESIDENT

Date: 10|13|2011

**Celcite Management Solutions, LLC**

By:

Title: HR MANAGER

Date: 10·13·11